136 F.3d 1070
 Joey Leon SMITH, Plaintiff-Appellant,
v.
Jeff THORNBURG, Kenneth Slagle, Chris Line, Jim Claiborne,
Ron Trentham, Mark Fortner, and The City of
Knoxville, Tennessee, Defendants-Appellees.
 No. 96-6456.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 28, 1997.
Decided Feb. 13, 1998.
 
 Herbert S. Moncier (argued and briefed), Knoxville, TN, for Plaintiff-Appellant.
 Robert H. Watson, Jr. (argued and briefed), John C. Duffy (briefed), Watson, Hollow & Reeves, Knoxville, TN, for Defendants-Appellees Thornburg, Slagle, Line, Claiborne, Trentham, Fortner.
 Ronald E. Mills (briefed), City of Knoxville Law Department, Knoxville, TN, Robert H. Watson, Jr., John C. Duffy, Watson, Hollow & Reeves, Knoxville, TN, for Defendant-Appellee City of Knoxville, Tennessee.
 Before: KENNEDY, NELSON, and CLAY, Circuit Judges.
 KENNEDY, J., delivered the opinion of the court, in which DAVID A. NELSON, J., joined. CLAY, J. (pp. 1078-1092), delivered a separate dissenting opinion.
 OPINION
 KENNEDY, Circuit Judge.
 
 
 1
 Plaintiff, Joey Leon Smith, appeals from the District Court's order granting summary judgment on behalf of the defendants in this action under 42 U.S.C. § 1983 and § 1985 for false arrest, false imprisonment, malicious prosecution, and conspiracy to violate plaintiff's civil rights. For the foregoing reasons, we AFFIRM the judgment of the District Court.
 
 I.
 
 2
 In the early morning hours of March 19, 1994, the Repeat Offender Unit of the Knoxville Police Department was conducting a buy/bust operation in the vicinity of the Green Hills Apartments, a housing project in Knoxville, Tennessee. Approximately fifteen to twenty officers, including all six of the defendant officers, were assigned to participate in the buy/bust operation. During the operation, a member of the unit attempted to engage in a drug transaction with an individual in the parking lot of the apartment complex. When the individual attempted to run off with the officer's money, other members of the unit quickly moved in and apprehended the suspect. During this operation, plaintiff, Joey Leon Smith,[1] had parked his car at the Green Hills Apartments to deliver car keys to his cousin who lived at Green Hills. Plaintiff parked his 1992 Dodge Stealth, valued at $40,000, approximately ten feet from where the officers ultimately apprehended the suspect who attempted to flee with the officer's money. Plaintiff's vehicle caught the attention of several officers involved in the operation for a variety of reasons. The car was unoccupied but the engine was running, the headlights were on, the doors were unlocked, the radio was turned on, and it was parked diagonally between two spaces.[2] The fact that the engine was running arose suspicion as stolen vehicles are frequently abandoned with their engines running because the ignitions have been tampered with during the theft process. Furthermore, Green Hills Apartments was known to the officers as a dumping ground for stolen vehicles and an area from which they had recovered many stolen vehicles. While officers Thornburg, Slagle, and Line approached plaintiff's vehicle, a vocal crowd gathered around the area where the suspect was being arrested. In addition, police identified by markings on their jackets and caps surrounded the area.
 
 
 3
 Officer Thornburg approached the driver's side door, and Officer Line approached the passenger side door. Meanwhile, Officer Slagle returned to his vehicle to run a license plate check to determine if the vehicle had been reported stolen. Officer Thornburg opened the unlocked driver's side door, knelt down, turned down the stereo, and looked at the ignition to see if it had been tampered with. Officer Line peered through the passenger side window at the steering column to determine whether it had been hotwired.
 
 
 4
 Plaintiff, in his cousin's apartment during these events, was alerted by a silent pager alarm that someone had opened the door to his car. Plaintiff ran from the apartment and in approximately 2.2 seconds reached his car in the parking lot. Plaintiff claims he saw in his car only someone dressed completely in black, stretched out across the front seat with his feet protruding from the driver's door and his eyes and hands in the area of the glove compartment. Plaintiff denies he saw anyone wearing a jacket, vest, or cap marked, "POLICE."
 
 
 5
 Plaintiff reached into his car and grabbed Officer Thornburg by the collar of his shirt and the seat of his pants, lifted him up, and pulled him out of his car.[3] A surprised Thornburg turned around and struck plaintiff in the mouth. Plaintiff and Thornburg fell to the ground and a struggle ensued. According to plaintiff, several unidentified officers joined the altercation and hit him in the back and shoulder with billy clubs and flashlights while shouting racial epithets at him. Plaintiff was eventually handcuffed and placed in the back of a squad car while dogs sniffed for drugs in plaintiff's vehicle. Plaintiff was charged with assaulting Officer Thornburg and, at a preliminary hearing, the charges were bound over to the Knox County Grand Jury; the Grand Jury did not return an indictment and the charges were dismissed.
 
 
 6
 As a result of these events, on March 17, 1995, plaintiff filed suit in state court against the defendants under 42 U.S.C. § 1983 and § 1985 alleging constitutional violations and seeking to recover for personal injuries and property damages resulting from his arrest, the search of his vehicle, and his subsequent prosecution. The action was removed to the United States District Court for the Eastern District of Tennessee and each defendant moved for summary judgment. On September 16, 1996, the District Court entered an order granting summary judgment on all of plaintiff's claims except for his state law claims for assault and battery against defendants Thornburg, Slagle and Line[4] which were remanded to state court.[5] Plaintiff appeals from the order granting summary judgment to the defendants.[6]
 
 II.
 
 7
 Our standard of review of a grant of summary judgment is de novo; we use the same test used by the District Court. See Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). We view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment is proper if the evidence " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " See Fed.R.Civ.P. 56(c); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988)(quoting Fed.R.Civ.P. 56(c)).
 
 III.
 
 8
 A. Fourth Amendment Violations: 1. Probable Cause to Search
 
 Plaintiff's Vehicle
 
 9
 Plaintiff first asserts that the District Court erred in concluding that the defendants did not violate his Fourth Amendment rights because probable cause existed to search his vehicle to determine whether it was stolen. Pursuant to the automobile exception to the warrant requirement, an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime. See California v. Carney, 471 U.S. 386, 390-94, 105 S.Ct. 2066, 2068-71, 85 L.Ed.2d 406 (1985); United States v. Wright, 16 F.3d 1429, 1437 (6th Cir.1994). We define probable cause as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir.1990). Probable cause exists when there is a " 'fair probability that contraband or evidence of a crime will be found in a particular place.' " Wright, 16 F.3d at 1437 (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Determining whether probable cause existed at the time of the search is a " 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.' " Id. (quoting Illinois v. Gates, 462 U.S. 213, 230, 103 S.Ct. 2317, 2338, 76 L.Ed.2d 527 (1983)). In determining whether probable cause exists, we may not look to events that occurred after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search. See United States v. Ferguson, 8 F.3d 385, 391-92 (6th Cir.1993)(en banc ).
 
 
 10
 We conclude that probable cause existed to search plaintiff's readily mobile vehicle due to the facts known to the officers at the time. Those facts were as follows: (1) an unoccupied expensive car was haphazardly parked at 12:40 a.m. in a high crime area; (2) the engine was running; (3) the headlights were on; (3) the doors were unlocked; (4) the radio was turned on; (5) stolen vehicles are frequently abandoned with their engines running because the ignitions have been tampered with during the theft process; (6) Green Hills Apartments was known to the officers as a dumping ground for stolen vehicles and an area from which they had recovered many stolen vehicles; (7) the Dodge Stealth is a frequently stolen vehicle; and (8) the unlocked and running car was parked only a few feet from a drug bust and within easy reach of any member of the crowd which gathered. Under these circumstances, the officers had probable cause to believe the Stealth may have been a stolen vehicle and, thus, enter the vehicle to determine whether it had been tampered with or to determine the identity of the owner. There is a dispute of fact regarding whether Officer Thornburg opened the glove compartment of Smith's vehicle during his search. Examining the facts in a light most favorable to plaintiff, we assume that Thornburg did open the glove compartment. However, we conclude that Thornburg was justified in doing so in order to assess the identity of the owner of the car. Common sense dictates that a cursory inspection of a vehicle's glove compartment may provide information from which an officer could determine the owner of the vehicle.
 
 
 11
 Plaintiff, however, stresses that his vehicle was on private, not public property, and thus police officers could not conduct a warrantless search of his automobile. In support of his contention that his vehicle was parked on private property, plaintiff submitted the affidavit of an employee of the Engineering Department of the City of Knoxville who attested that the parking area for Green Hills Apartments is private property. However, both plaintiff and the officers believed that the car was parked on public property.
 
 
 12
 Assuming that the complex parking lot is private property and that the distinction changes the Fourth Amendment analysis under the facts of this case, we conclude that the search of the vehicle was nevertheless lawful. First, exigent circumstances permitted the officers to conduct a warrantless examination of a vehicle that was unlocked and running in an area where a crowd had gathered. In only a matter of seconds, an individual could have taken the car or the car could have injured any member of the crowd or a police officer had it slipped out of gear. It would have been unreasonable to expect the officers to determine first whether the property, appearing to be public even to the plaintiff, was instead private property and to then seek a warrant upon learning that the property was indeed private.
 
 
 13
 Second, the manner in which plaintiff parked his car violated section 55-8-162 of the Tennessee Code which provides:
 
 
 14
 No person driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition, and effectively setting the brake thereon and, when standing upon any grade, turning the front wheels to the curb or side of the highway.
 
 
 15
 Tenn.Code Ann. § 55-8-162. Under the community caretaking function enunciated by the Supreme Court in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), we conclude that officers were entitled to enter the car without a warrant in order to protect themselves and the public from the danger created by the manner in which plaintiff's car was left unattended. See Dombrowski, 413 U.S. at 448, 93 S.Ct. at 2531 (warrantless search of an automobile permissible where police suspected the car contained a gun and was vulnerable to intrusion); see also United States v. Rohrig, 98 F.3d 1506 (6th Cir.1996)(warrantless entry into house permitted in order to abate the ongoing nuisance of loud music). We, thus, cannot conclude that their actions were unreasonable under the Fourth Amendment.
 
 
 16
 Lastly, even if we were to assume that a warrantless search of the vehicle on private property was unlawful under the Fourth Amendment, we would conclude that the officers' reasonable mistake of fact in presuming that the property was public would be protected by qualified immunity. See Pray v. City of Sandusky, 49 F.3d 1154, 1159-62 (6th Cir.1995)(officers' reasonable mistake in entering residence other than the one authorized by the search warrant was protected by qualified immunity until the point when officers knew or should have known a mistake had been made).
 
 
 17
 For all of these reasons, the District Court correctly concluded that the defendants did not violate plaintiff's Fourth Amendment rights.
 
 
 18
 2. Probable Cause to Arrest Plaintiff/False Imprisonment
 
 
 19
 Plaintiff also alleges the defendants violated his Fourth Amendment rights when they arrested him for assault without probable cause.[7] Section 39-13-101 of the Tennessee Code defines assault as either:
 
 
 20
 (1) Intentionally, knowingly or recklessly caus[ing] bodily injury to another;
 
 
 21
 (2) intentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury; or
 
 
 22
 (3) Intentionally or knowingly caus[ing] physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.
 
 
 23
 Tenn.Code Ann. § 39-13-101. We reject plaintiff's first argument that his conduct did not fall within any of the definitions of assault set forth above. We have little doubt that grabbing Officer Thornburg by the shirt and pants and pulling him out of the car constitutes an assault under § 39-13-101(3). Plaintiff contends, however, that he had an absolute right under § 39-11-614(a) of the Tennessee Code to use force against Officer Thornburg in order to protect his property. That section provides:
 
 
 24
 (a) A person in lawful possession of real or personal property is justified in threatening or using force against another when and to the degree it is reasonably believed the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property.
 
 
 25
 Tenn.Code Ann. § 39-11-614(a). In order to determine whether the warrantless arrest was constitutional under the Fourth Amendment, we must determine whether probable cause existed for the arrest. The question we must answer is " 'whether, at the moment the arrest was made, the officers had probable cause to make it--whether at that moment the facts and circumstances within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " Donovan v. Thames, 105 F.3d 291, 298 (6th Cir.1997)(quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)).
 
 
 26
 We disagree with plaintiff's contention that defendants did not have probable cause to arrest him for assault because he had a right to use force to protect his property pursuant to § 39-11-614(a). Under the Tennessee provision, an owner of property may use that force which is immediately necessary to prevent or terminate a trespass on the land or unlawful interference with the property. Because we have concluded that Officer Thornburg was lawfully inside of plaintiff's vehicle, Officer Thornburg was not unlawfully interfering with plaintiff's property. Furthermore, although plaintiff contends he never saw any of the marked police uniforms or Thornburg's police jacket, the facts and circumstances within the knowledge of the arresting officers were that plaintiff knowingly pulled a police officer with force out of the vehicle thereby committing an assault upon a police officer. In determining whether probable cause to arrest exists, the knowledge of the arresting officers, not the suspect, is determinative. Under these circumstances, the officers could have reasonably believed that § 39-11-614(a) would not apply where an identified police officer, in the vicinity of fifteen to twenty other identified police officers is, without warning,[8] pulled out of a vehicle he is lawfully inspecting to determine whether it is stolen.
 
 
 27
 Thus, the District Court properly concluded that the facts known to the officers were sufficient to warrant a prudent officer in believing that plaintiff had committed an offense.[9]
 
 B. Malicious Prosecution
 
 28
 Plaintiff further contends that the District Court erred in granting summary judgment for the defendants on his claim for malicious prosecution of the assault charge against him. The District Court dismissed the claim on the ground that reasonable minds could not differ as to whether plaintiff committed an assault upon Officer Thornburg under the definition set forth in § 39-13-101(a)(3) of the Tennessee Code. While we agree that this claim was properly dismissed because there was probable cause to arrest plaintiff, we arrive at this conclusion for an additional reason not articulated by the District Court.
 
 
 29
 The law of our Circuit provides that where "the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action." Coogan v. City of Wixom, 820 F.2d 170, 175 (6th Cir.1987).
 
 
 30
 In the instant case, a preliminary hearing was held in the Knox County General Sessions Court on July 1, 1994. At that hearing, plaintiff's counsel examined several witnesses, including Officer Thornburg and the plaintiff and, at the conclusion of the hearing, plaintiff's counsel moved to dismiss the assault charge asserting that the use of force in defense of plaintiff's property was justified under § 39-11-614 of the Tennessee Code. Despite plaintiff's reliance on § 39-11-614, the court ruled that probable cause existed to bind over the assault charge to the grand jury. Thus, because plaintiff had a full and fair opportunity to litigate whether probable cause existed to maintain an assault charge against him,[10] he is barred from relitigating that issue in this § 1983 action.C. 42 U.S.C. § 1985(3)
 
 Conspiracy
 
 31
 Plaintiff also brought an action under 42 U.S.C. § 1985(3) alleging a conspiracy by the defendant police officers to deprive him of the equal protection of the laws. To maintain a cause of action under § 1985(3), a plaintiff must establish the following four elements:
 
 
 32
 (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.
 
 
 33
 Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 839 (6th Cir.1994), cert. denied, 514 U.S. 1066, 115 S.Ct. 1698, 131 L.Ed.2d 560 (1995). The plaintiff further must demonstrate that the conspiracy was motivated by a class based animus, such as race. Id.; see also Collyer v. Darling, 98 F.3d 211, 233 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997).
 
 
 34
 The District Court concluded there was a total absence of any evidence suggesting that the defendant officers discriminated against plaintiff because he was black. While, for purposes of this motion we assume that racial epithets were uttered at plaintiff by someone after he grabbed Officer Thornburg,[11] we nevertheless conclude that there is a noticeable absence of any evidence of a conspiracy to deprive plaintiff of his constitutional rights. Plaintiff has introduced no evidence that defendants acted in concert or in furtherance of a common objective. In fact, the circumstances evince an occurrence of events much too quick to suggest that a conspiracy to deprive the plaintiff of his constitutional rights on the basis of his race was orchestrated. Officers did not even know the identity or race of the plaintiff until after Thornburg had entered the vehicle and after Thornburg was assaulted by plaintiff. In the absence of any evidence that the defendants agreed to deprive plaintiff of his constitutional rights, we conclude that the District Court properly granted summary judgment on behalf of the defendants on plaintiff's § 1985(3) claim.[12]
 
 IV.
 
 35
 For the foregoing reasons, the judgment of the District Court is AFFIRMED.
 
 
 36
 CLAY, Circuit Judge, dissenting.
 
 
 37
 I respectfully dissent from the Court's opinion inasmuch as the majority's account of the facts disregards significant aspects of the record and de-emphasizes the egregious conduct of the defendant officers. I write separately to express my disagreement for the reasons stated herein.
 
 I.
 
 38
 A discussion of the factual background is essential to an understanding of what occurred in this case.
 
 
 39
 On Friday, March 18, 1994, the Repeat Offender Unit of the Knoxville Police Department was assigned a "buy/bust" operation, in which undercover officers in unmarked vehicles are sent into certain city neighborhoods in an effort to purchase illegal narcotics. (J.A., Trentham Dep., at 185.) Such operations "target[ ] street dealers in the housing developments and the areas which directly surround them." Id., Claiborne Dep., at 169. There was police testimony that in the course of their undercover operations, the police go to all of the housing developments, which are predominantly African American. Police testimony further alleged such housing developments to be "known drug trafficking areas." Id. at 170.
 
 
 40
 With respect to the buy/bust operation at issue in this appeal, a total of fifteen to twenty officers, including Officers Thornburg, Slagle, and Line ("Defendants"),[1] were assigned to participate in the operation. At approximately 12:40 a.m., on March 19, 1994, one of the participating officers positioned his unmarked vehicle in the parking lot of the Green Hills Apartments. Sometime within the next ten to fifteen minutes, this officer was approached by an unknown African-American male who, allegedly, attempted a drug transaction but then grabbed the officer's money and tried to run. Other officers from various "take down" positions moved in and quickly apprehended the suspect in the parking lot. While the suspect was on the ground being handcuffed, approximately ten to twenty citizens gathered and allegedly yelled obscenities at the police officers. Id., Trentham Dep., at 187.
 
 
 41
 By the time Defendants entered the parking lot with their vehicle, the suspect was already in custody. Defendant Slagle parked his vehicle approximately fifteen to twenty feet from a green, 1992 Dodge Stealth automobile which, in turn, was parked approximately ten feet from where the suspect had been arrested. Allegedly, the Dodge Stealth raised the suspicion of Defendants,[2] who left their vehicle and walked toward the Dodge Stealth for further investigation. Defendant Thornburg approached the driver's side door, and Defendant Line approached the passenger's side door while Defendant Slagle, at the request of Defendant Thornburg, returned to Defendants' vehicle, supposedly to run a license plate check to determine if the Dodge Stealth had been reported stolen. Defendants proceeded with the search of the vehicle without awaiting the results of the license plate check. Defendant Thornburg states that he opened the driver's side door and got into the car, kneeling in the driver's seat long enough to turn down the stereo and look at the ignition. Id., Thornburg Interview, at 126.
 
 
 42
 Meanwhile, Joey Leon Smith ("Plaintiff"), while chatting with his cousin inside his cousin's nearby apartment in the Green Hills Apartments, was alerted that someone had entered his vehicle when his silent, burglar-alarm pager was activated. Plaintiff is an African American and, at the time of this incident, was a professional football player with the New York Giants. Plaintiff was born and raised in Knoxville, Tennessee, and maintains a residence in East Knoxville; his cousin's apartment, in the Green Hills Apartments, is located about one block from Plaintiff's house. Id., Smith Dep., at 63. On the evening of March 19, 1994, Plaintiff was in Knoxville for a community charity event; a former teammate had established a "Team Dream Foundation" for the underprivileged youth in the community, and Plaintiff was in Knoxville to attend a banquet and celebrity basketball game. Plaintiff had gone to the Green Hills Apartments to drop off the keys to his Ford Explorer automobile with his cousin. His cousin was going to use the Ford Explorer to transport a childrens' basketball team that Plaintiff coached to their game, which was scheduled for the next day. Plaintiff could not take the children himself because he was participating in the charity basketball game.
 
 
 43
 When Plaintiff got to his cousin's apartment, he was in a rush to get back to see his fiancee; consequently, he left his car running in the parking lot, with the keys in the car, and ran to his cousin's apartment to deliver the other set of keys. According to Plaintiff, the radio was on but not blaring; the windows were rolled all the way up; the doors were unlocked; and the burglar alarm was set.[3] Id., Tr. Prelim. Hr'g, at 207. Plaintiff was in his cousin's apartment for "a minute or two" when his alarm pager was activated. Id. at 205.
 
 
 44
 From this point forward, Plaintiff's and Defendants' accounts of the events greatly diverge. Plaintiff alleges the following. He states that he ran to his vehicle and saw that the driver's side door was open and that a man, dressed in black, was lying sideways across the armrest of his car looking in the glove compartment. Id., Smith Dep., at 61, Tr. Prelim. Hr'g, at 202, 207-08. Plaintiff grabbed the intruder by the back of his shirt and pants and pulled him out of the car. Startled, the man, Defendant Thornburg, immediately identified himself as a police officer. Plaintiff responded, "Hey, this is my car that you have broken into." Id., Smith Dep., at 61. Defendant Thornburg's demeanor changed once Thornburg saw other officers coming to his aid, id., Tr. Prelim. Hr'g, at 203; Thornburg then became belligerent and told Plaintiff "You don't touch MF. MF, I'm an officer...." Id., Smith Dep., at 62. Thornburg then produced his billy club and began hitting Plaintiff; other officers also began hitting Plaintiff on the head and all over his body with flashlights. Id., Smith Dep., at 62, Tr. Prelim. Hr'g, at 203. Plaintiff's cousin contends that the other officers "hit [Plaintiff] with a radio, with what appeared to be a billy stick or black flashlight, and with their fists and feet." Id., Smith Aff., at 46. Plaintiff was slung into the middle of the parking lot, thrown to the ground, and handcuffed.[4] Id., Smith Dep., at 62, Tr. Prelim. Hr'g, at 203. Plaintiff was later put into a police Bronco.
 
 
 45
 Plaintiff alleges that, during these events, he was told by one of the officers, "you are not going to no celebrity basketball game tomorrow, Mr. Drug Dealer." Id., Tr. Prelim. Hr'g, at 203. Other racial slurs allegedly were used at the scene of the arrest by unidentified officers. Plaintiff asserts that he was called a "Nigger, drug dealer" and a "Black MF." Id., Smith Dep., at 75. Also, Plaintiff's cousin states in his affidavit that he overheard some white officers discussing "how a black guy could afford a vehicle like this" and asking "what was he doing in a low income project." Id., Smith Aff., at 47. Further, one officer said, "he must be rolling[5] pretty good, he drives a better car than I do." Id.
 
 
 46
 Defendants' rendition of the events is as follows. Defendant Thornburg maintains that he opened the car door, bent over, turned down the stereo, looked at the ignition and the steering column, and got back out. He was standing between the door and the body of the car when Plaintiff struck him from behind, punching him in the back of the head two or three times. The testimony of the other Defendants basically corroborates Defendant Thornburg's testimony. That is, Defendants Slagle and Line, as well as other officers, state that Defendant Thornburg was not inside Plaintiff's vehicle and that Plaintiff, in some manner, struck Defendant Thornburg. Further, while Defendants state that Plaintiff was taken into custody, they do not elaborate on whether Plaintiff was beaten with flashlights and billy clubs during this process.
 
 
 47
 According to Plaintiff, after he was placed in the Bronco, officers searched Plaintiff's vehicle using police dogs. No contraband or drugs were found; however, the interior upholstery of Plaintiff's vehicle was torn in several places during the search. Plaintiff was subsequently transported to the Knox County jail. He was eventually released on a $500 bond. Plaintiff's vehicle was not towed but was released to his father.
 
 
 48
 Ultimately, Plaintiff was charged with assaulting Defendant Thornburg. The charges were referred to the Knox County Grand Jury, which returned a not-true bill against Plaintiff when the matter was presented, and the charge was dismissed.
 
 
 49
 On March 17, 1995, Plaintiff filed suit in state court against Defendants under, inter alia, 42 U.S.C. § 1983 and 42 U.S.C. § 1985. The action was removed to the United States District Court for the Eastern District of Tennessee. Plaintiff presently appeals from the district court's September 16, 1996, Order and Memorandum Opinion, dismissing on summary judgment his § 1983 and § 1985 claims, and his assault and battery claims against Officers Claiborne, Trentham, Fortner, and the City of Knoxville. The district court's Order remanded to state court Plaintiff's claims for assault and battery against Defendants Thornburg, Slagle and Line. Plaintiff's appeal waives certain of his § 1983 claims, i.e., offensive racial comments and property damage to his automobile, and his assault and battery claims, by omitting all discussion of such claims from his brief.
 
 II.
 
 50
 A. Probable Cause to Search Plaintiff's Vehicle
 
 
 51
 The majority concludes that, under the circumstances, Defendants had probable cause "to believe the Stealth may have been a stolen vehicle and, thus, [to] enter the vehicle to determine whether it had been tampered with or the identity of the owner." (Op. at 1075.) Yet, Defendants' testimony regarding their basis for searching Plaintiff's vehicle is grossly inconsistent, which creates genuine issues of material fact as to probable cause.
 
 
 52
 When Defendants were first interviewed by the Internal Affairs Unit regarding this incident, Defendants Slagle and Line indicated that the search of Plaintiff's vehicle was conducted as a search incident to the arrest of the suspect who had been taken into custody within ten feet of the vehicle. These statements directly conflict with their subsequent deposition testimony that the search was conducted because Plaintiff's car appeared to be an abandoned, stolen vehicle.
 
 
 53
 Defendant Slagle stated the following in his interview with Internal Affairs: "And our first impression, my impression I was sitting in the car, but my first impression was that it was the car the subject was in 'cause the motor was running. He was arrested..you know, within 10 feet of it. So we checked car [sic]...." (J.A., Slagle Interview, at 132.) Similarly, Defendant Line stated the following in his Internal Affairs interview: "We thought it was the subject we took down's vehicle 'cause he was standing directly next to it. The engine was running. Officer Thornburg looked inside the vehicle, I assume to see if there's any contraband or weapons laying in plain view." Id., Line Interview, at 139.
 
 
 54
 Later, in their depositions, however, Defendants Slagle and Line developed the story that they searched Plaintiff's vehicle because they believed it was an abandoned, stolen vehicle. Yet, as described above, these Defendants admitted that the facts within their knowledge at the time of the search were not that the car had been left in an abandoned state but rather that the vehicle was running and unoccupied because its driver was being taken to jail. Further, these Defendants have admitted that they searched the vehicle based on their understanding that the driver of the vehicle had just been arrested--not based on their belief that the car was an abandoned, stolen vehicle.
 
 
 55
 Defendants' inconsistent testimony creates issues of fact regarding the factual basis for probable cause that must be resolved by a jury. See Garris v. Rowland, 678 F.2d 1264, 1270 (5th Cir.) ("Where there is no conflict in evidence, the court may make its own legal determination of probable cause. But where facts relied upon to show probable cause in a § 1983 action are controverted, they must be resolved by the jury before controlling legal principles can be applied. It is axiomatic that the jury is the sole judge of the facts of the case.") (citation omitted), cert. denied, 459 U.S. 864, 103 S.Ct. 143, 74 L.Ed.2d 121 (1982); McKenzie v. Lamb, 738 F.2d 1005, 1007 (9th Cir.1984) ("[I]n a § 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury....") It is inappropriate for the majority to decide that probable cause existed to search the car for evidence of theft when the facts allegedly constituting probable cause are currently in dispute.
 
 
 56
 In addition, even assuming that the factual basis for probable cause were not in dispute, the objective facts known to Defendants at the time of the search, and relied upon by the majority, did not create probable cause to believe that the vehicle contained evidence of a crime. The facts known to the officers did not make it probable or present a substantial chance that the vehicle was stolen. Rather, the facts supported nothing more than a mere suspicion that the vehicle might be stolen. See United States v. Ferguson, 8 F.3d 385, 392 (6th Cir.1993) (discussing probable cause standard), cert. denied, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994).
 
 
 57
 A discussion of the facts which the majority claims provided the basis for probable cause is in order. To begin, the majority emphasizes the fact that it was 12:40 a.m. when Defendants spotted Plaintiff's vehicle. Presumably, this fact is relevant because it tends to negate the inference that the vehicle was left temporarily by its owner, since people are not usually active and mobile at this time of the day. However, the majority disregards other facts, known to Defendants, which suggest that, despite the late hour, there was a high level of human activity in the Green Hills Apartments. Firstly, it was a Friday night; and the Green Hills Apartments is located in the city, not the suburbs. Secondly, the police themselves were in the area trying to engage in drug transactions, which means that the police believed, for whatever reasons, that dealers would still be on the streets looking for customers and that potential customers would be out and about. This scenario suggests that the housing development is still teeming with people at this hour. Thirdly, and perhaps most significant, according to Defendants themselves, a crowd of ten to twenty people gathered, at this time, while police arrested the first suspect. Accordingly, the facts indicate that, despite the hour, there was plenty of human activity in the Green Hills Apartments; such activity supported an inference that the vehicle had not been stolen and abandoned but rather had been left momentarily by its owner.
 
 
 58
 The majority also relies on the following circumstances in concluding that probable cause existed: the vehicle was unoccupied and parked haphazardly; the headlights were on; the engine was running; the radio was turned on; the doors were unlocked; and stolen vehicles, according to Defendants, are frequently left in this condition. Yet, given that there was significant human activity taking place in the area, these facts are innocuous; they support an inference that the vehicle had been left by its owner momentarily as much as they support an inference that the vehicle had been stolen and abandoned.
 
 
 59
 The majority relies on the Defendants' unsubstantiated contention that the Green Hills Apartments is a high crime area, apparently arguing that it is reasonable to assume that one would not leave, even momentarily, a vehicle in such a condition in such an area. Yet, the level of criminal activity in the area is a fact that is presently in dispute. While Defendants claim that the Green Hills Apartments is a high crime area, Plaintiff has testified that he has lived in the area all of his life, does not consider the area high crime, and had no worries about leaving his car unoccupied. (See J.A., Smith Dep., at 63.)
 
 
 60
 Construing the evidence in Plaintiff's favor, a jury could find that there is no unusual incidence of property crime in the Green Hills Apartments and that the nature of the area is such that residents might, momentarily, leave their vehicles running and unoccupied. Accordingly, it is inappropriate to use the "high crime" nature of the area as a basis for probable cause, especially since Defendants have offered nothing in support of their contention that this is a high crime area other than their unsubstantiated assertions.
 
 
 61
 The majority also finds persuasive Defendants' contention that the Dodge Stealth is a frequently stolen vehicle. There is no indication, however, that Defendants were aware of this and relied on this fact in finding probable cause to search Plaintiff's vehicle. The majority relies on a statement by officer Claiborne--who did not take part in the search--that "a Dodge product is a highly stolen vehicle now." Id., Claiborne Interview, at 108. Nowhere in the record do Defendants state that they were aware that Dodges are frequently stolen vehicles and considered this fact in determining probable cause.
 
 
 62
 The majority also relies on the fact that the car "was parked only a few feet from a drug bust and within easy reach of any member of the crowd which gathered." (Op. at 1075.) How this situation supports a belief that the vehicle would contain evidence of a crime eludes rationality.
 
 
 63
 Finally, given that the above-described circumstances are entirely consistent with a vehicle that has been left temporarily unoccupied by its owner, the allegation that the Green Hills Apartments is a known dropping off place for stolen vehicles merely makes the condition of the vehicle somewhat suspicious. Rather than immediately search the vehicle, the police officers had available to them less intrusive measures that could have been taken; for example, the police could have taken a moment to call in the license number of the vehicle, before proceeding with the search, in order to determine whether the vehicle had been reported stolen. Although Defendant Thornburg asked Defendant Slagle to call in the license plate check, Thornburg proceeded with the search without waiting for Slagle to do so. The police also could have taken a few minutes to inquire with people on the street in the immediate vicinity of the vehicle as to the ownership of the vehicle, and they could have knocked on the door of the dwelling in closest proximity to the vehicle to determine whether the vehicle's owner was in the dwelling. The officers' failure to take these modest measures before proceeding with the search casts doubt on the issue of whether the police acted reasonably and in good faith in making their probable cause determination.[6]
 
 
 64
 For the foregoing reasons, the objective facts relied upon by the majority do not establish probable cause.
 
 
 65
 Even if one were to assume that Defendants had probable cause to search Plaintiff's vehicle to determine if it were stolen, the search should have ended when Defendant Thornburg saw that the ignition was intact and the keys were in the ignition. At that point, there was no longer any basis to believe that the vehicle was stolen; and the facts known to the officers supported the conclusion that the owner had simply momentarily left the vehicle. Thus, if Defendant Thornburg went inside the glove box, as Plaintiff maintains, he did so without probable cause and in violation of Plaintiff's Fourth Amendment rights. See United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir.1993) (finding new information can negate prior determination of probable cause); United States v. Bizier, 111 F.3d 214, 219 (1st Cir.1997) (intervening information can weaken probable cause). Under the circumstances present here, Plaintiff can establish a Fourth Amendment violation based solely upon the search of the glove box.
 
 
 66
 As an alternative basis for finding probable cause to search Plaintiff's vehicle, the district court also relied on Tennessee Code section 55-8-162 and Knoxville City Ordinance section 17-191. The majority, in its opinion, also relies on Tennessee Code section 55-8-162. The statute section and the ordinance section are almost identical, and both require a driver to turn off his engine before leaving his vehicle unattended. See Tenn.Code Ann. § 55-8-162 (1997); Knoxville, Tenn., Ordinance § 17-191.
 
 
 67
 Section 55-8-162 is inapplicable to private property, however. See Beene v. Cook, 43 Tenn.App. 692, 311 S.W.2d 596, 600 (1957) ("[55-8-162] probably does not apply where the vehicle is parked off a public road or street...."). Section 17-191 is, presumably, also inapplicable to private property since it is modeled after Section 55-8-162. It is undisputed that the parking lot of the Green Hills Apartments is private property. (See J.A., Holloway Aff., at 51-52.) Accordingly, Plaintiff had not committed an offense by leaving his vehicle on private property, unattended, with the engine running; and Defendants did not have probable cause to believe an offense had been committed because they had no knowledge of whether the parking lot was private or public property.
 
 
 68
 The majority also concludes that, under the community care taking function enunciated in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), Defendants were entitled to enter Plaintiff's vehicle, without a warrant, in order to protect themselves and the public from the danger created by the manner in which Plaintiff's vehicle was left unattended. However, while the authority cited by the majority may support the proposition that Defendants were entitled to enter Plaintiff's vehicle to abate the danger posed by an unlocked, unoccupied, running vehicle, these cases do not suggest that Defendants were also entitled to search Plaintiff's glove box. That is, under the circumstances, this case law only permitted Defendants to make a warrantless entry of Plaintiff's vehicle for the limited purpose of turning off the engine and securing the vehicle; it did not give Defendants permission to conduct a warrantless search of the vehicle.
 
 
 69
 In Cady, it was permissible to conduct a warrantless search of a vehicle to find a gun which presented a threat to the public's safety. Here, however, the threat to public safety was the fact that the car was left unoccupied with the engine running; thus, a search of the vehicle was not necessary to protect the public. Similarly, in United States v. Rohrig, 98 F.3d 1506 (6th Cir.1996), the police were allowed to enter a home without a warrant in order to turn down a stereo or to find an occupant to turn down the stereo. This case does not stand for the proposition that, once the police were properly in the home, they had the authority to search the entire premises. Rather, Rohrig indicates that it was permissible to enter the home for the limited purposes described above. See Rohrig, 98 F.3d at 1525-26; see also United States v. Johnson, 22 F.3d 674, 680 (6th Cir.1994) (finding that warrantless entry of home to free victim being held against will could not lawfully be expanded to include search of home's closets).
 
 
 70
 Plaintiff has testified that he saw Defendant Thornburg searching his glove box. Contrary to the majority's assertion, under these circumstances, such conduct by Defendants cannot be justified under either of the cases cited by the majority.
 
 
 71
 Finally, the district court also found that no warrant was necessary to search Plaintiff's vehicle because it appeared to be abandoned. In determining whether Plaintiff abandoned his vehicle, the appropriate inquiry is whether Plaintiff had any legitimate expectation of privacy in the vehicle. See United States v. Tolbert, 692 F.2d 1041, 1044 (6th Cir.1982) (quoting Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)), cert. denied, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). We must consider whether Plaintiff, by his conduct, exhibited an actual, subjective expectation of privacy, and whether that subjective expectation is one that society recognizes as reasonable. See id. at 1044-45.
 
 
 72
 Viewing the evidence in the light most favorable to Plaintiff, Defendants could not conclude that Plaintiff had given up his expectation of privacy in his vehicle. See United States v. Oswald, 783 F.2d 663, 666-68 (6th Cir.1986) (discussing indicia of abandonment); United States v. Sanders, 719 F.2d 882, 886 (6th Cir.1983) (describing conduct demonstrating a continued legitimate expectation of privacy). As previously discussed, the condition of Plaintiff's vehicle was consistent with a situation in which the driver has simply momentarily left his vehicle to run a quick errand. Defendants, apparently, did not wait even two minutes to see if the driver of the vehicle would return before they began to search the vehicle. (See J.A., Tr. Prelim. Hr'g, at 205.) One can hardly say that leaving a vehicle in the condition Plaintiff left his for two minutes evidences a lack of expectation of privacy. Furthermore, accepting Plaintiff's rendition of the facts as true, the condition of the vehicle illustrated that Plaintiff intended to keep its contents private. That is, the doors were closed; the windows were rolled up; the alarm was set; and Plaintiff remained within close proximity of the vehicle to guard against intruders.
 
 
 73
 Accordingly, the facts clearly evidence an interest in keeping the contents of the vehicle private. Moreover, Plaintiff's expectations of privacy under these circumstances were entirely reasonable; one should feel secure that he can momentarily leave his vehicle running and unattended in order to run a quick errand, without giving the government license to search his vehicle. It cannot be said that Plaintiff, under these circumstances, had abandoned his vehicle.
 
 
 74
 For the foregoing reasons, Plaintiff can show that Defendants' search of his vehicle violated his Fourth Amendment rights; accordingly, the district court should not have granted summary judgment as to this claim.
 
 B. Malicious Prosecution
 
 75
 The district court found that Plaintiff's claim under Section 1983 for malicious prosecution must be dismissed because probable cause existed, as a matter of law, for Defendants to arrest Plaintiff for assault. However, probable cause for Defendants to arrest Plaintiff for assault did not exist as a matter of law. While Plaintiff clearly committed an assault under Tennessee Code section 39-13-101(a), see Tenn.Code Ann. § 39-13-101(a) (1997), construing the evidence in Plaintiff's favor, Tennessee Code section 39-11-614(a), affording justification for the defense of personal property, also clearly applies in this instance. See Tenn.Code Ann. § 39-11-614(a) (1997).
 
 
 76
 That is, under the facts described by Plaintiff, it was reasonable for Plaintiff to believe that the force he used was immediately necessary to terminate Defendant Thornburg's unlawful interference with his property.[7] Plaintiff's alarm pager alerted him that an intruder was in his car. Plaintiff ran to his car while shouting "Hey, Hey, my car. Who is in my car? Hey, Hey." (J.A., Smith Dep., at 62.) Plaintiff's cousin says that, as Plaintiff was running up the sidewalk, he was yelling "who is that in my car, what are you doing, who is that[?]" Id., Smith Aff., at 45. When Plaintiff reached the car, he saw a man in all black stretched across his seats looking in the glove box. Plaintiff alleges that he removed the individual from the vehicle by pulling him by the seat of his pants and by his shirt collar.
 
 
 77
 Plaintiff had given the intruder an opportunity, albeit a brief one, to leave or to explain his actions; Plaintiff then removed the intruder, using as little force as possible to accomplish the task. Given the circumstances, it is wholly unreasonable to expect Plaintiff to have waited and politely asked the intruder to leave, before using force; Plaintiff, understandably, was concerned for his property and for his safety, and did not want to risk giving the intruder enough time to react violently.
 
 
 78
 Consequently, Defendants would not be warranted in believing that Plaintiff had committed an illegal assault. The majority argues that, in determining whether probable cause to arrest exists, the knowledge of the arresting officers, not the suspect, is determinative. They contend that "[u]nder these circumstances, the officers could have reasonably believed that § 39-11-614(a) would not apply where an identified police officer, in the vicinity of fifteen to twenty other identified police officers is, without warning, pulled out of a vehicle he is lawfully inspecting to determine whether it is stolen." (Op. at 1077.)
 
 
 79
 Yet, construing the evidence in the light most favorable to Plaintiff, a jury could determine that Defendants could not reasonably believe that Plaintiff had knowingly assaulted a police officer. To begin, the number of officers that were in the immediate vicinity is presently in dispute. Plaintiff's cousin has testified that "[a]s Joey was running toward his car, there were no other persons visible in the stairs, sidewalk or in the parking area around Joey's car." (J.A., Smith Aff., at 45.) Similarly, Plaintiff states that he did not see any police in the area. Id., Smith Dep., at 64. Also, it was dark outside and visibility was poor. Defendant Thornburg, according to Plaintiff, was positioned on his side so that the police insignia on his jacket was not visible. Plaintiff was screaming "who is in my car" as he was running[8] and informed Defendant Thornburg, immediately after he pulled Thornburg from the car, that he thought his vehicle was being broken into. A jury could reasonably find, based on Plaintiff's version of the facts, that Defendants could not have reasonably concluded that Plaintiff had knowingly assaulted a police officer. Accordingly, the jury could also conclude that Defendants could not have reasonably believed that Plaintiff's justification defense would not apply.
 
 
 80
 Therefore, there are genuine issues of material fact remaining regarding the element of lack of probable cause for purposes of establishing Plaintiff's malicious prosecution claim.[9]
 
 
 81
 The majority relies on an additional reason, not articulated by the district court, for finding that there was probable cause to arrest Plaintiff for assault and, consequently, that Plaintiff's malicious prosecution claim was properly dismissed. That is, the majority contends that "where 'the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.' " (Op. at 1077 (quoting Coogan v. City of Wixom, 820 F.2d 170, 175 (6th Cir.1987)).) In this instance, a preliminary hearing was held, in the Knox County General Sessions Court, in which that court ruled that probable cause existed to bind over the assault charge to the grand jury. The majority argues that, because Plaintiff had a full and fair opportunity to litigate probable cause, Plaintiff is barred from relitigating this issue in this Section 1983 action.
 
 
 82
 The majority relies on Coogan for its assertion that Plaintiff is barred from relitigating the issue of probable cause; yet, Coogan, read in its entirety, makes clear that Plaintiff is not precluded by collateral estoppel from raising the issue of probable cause in his § 1983 action. The majority disregards the following language in Coogan:
 
 
 83
 We do not hold that every determination in a preliminary hearing should be given preclusive effect in a subsequent § 1983 action. Some preliminary hearings are little more than formalities. Also, even when an opportunity for full adversary proceedings is afforded, strategic concerns may counsel against engaging in such an exercise at the early stages of a criminal proceeding. However, where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.
 
 
 84
 Coogan, 820 F.2d at 175 (emphasis added).
 
 
 85
 The record of the preliminary hearing makes clear that Plaintiff, presumably for strategic reasons, did not avail himself of a full adversary proceeding. Although Plaintiff and Defendant Thornburg did testify at the preliminary hearing, Plaintiff did not call numerous other witnesses essential to the probable cause determination. For example, Plaintiff did not call his cousin to testify; his cousin witnessed the entire incident and could have testified regarding Plaintiff's use of force and the perceived need to use force. Further, Plaintiff did not even call Defendants Slagle and Line, who were directly involved in the alleged assault, or numerous other officers or bystanders who witnessed the incident. Thus, the record indicates that Plaintiff did not engage in a full adversary proceeding to contest probable cause; accordingly, the state court's determination should not be given preclusive effect.
 
 
 86
 In addition, the state court's determination of probable cause should not be given preclusive effect in this instance because the issue was not fully and fairly litigated.
 
 
 87
 Federal courts are to apply state collateral estoppel law when determining whether a state court judicial determination has preclusive effect in a particular Section 1983 action. Josey v. Salisbury, 14 F.3d 601, No. 92-2093, 1993 WL 476974, at * 2 (6th Cir. Nov. 18, 1993) (citing Haring v. Prosise, 462 U.S. 306, 313, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595 (1983)). In Tennessee, the law of collateral estoppel is as follows:
 
 
 88
 The doctrine of collateral estoppel bars the same parties or their privies from relitigating in a second suit issues that were actually litigated and determined in a former suit. This doctrine does not apply to issues that were not necessary for the decision in the former case or when the party against whom the preclusion is sought did not have a full and fair opportunity to litigate the issue in the prior suit. One defending on the basis of res judicata or collateral estoppel must demonstrate that (1) the judgment in the prior case was final and concluded the rights of the party against whom the defense is asserted, and (2) both cases involved the same parties, the same cause of action, or identical issues.
 
 
 89
 Uselton v. Conwood Co., LP, No. 02S01-9607-CV-00070, 1997 WL 76807, at * 3 (Tenn. Feb. 25, 1997) (citations omitted).
 
 
 90
 The state court's determination of probable cause should not be given preclusive effect in this instance because the condition that the issue be fully and fairly litigated in the initial proceeding is lacking. Here, the state court based its finding of probable cause on its belief that Plaintiff's justification defense was inapplicable because Plaintiff had failed to make some inquiry into the circumstances before he used physical force. (See J.A., Tr. Prelim. Hr'g, at 214 ("The first thing you have to do is the least violent thing available to you to find out what is going on. Now, it is for that reason that the Court finds that the defense of justification is not applicable.").)
 
 
 91
 Yet, Plaintiff's counsel had brought to the court's attention that as Plaintiff "was running up he was yelling, hey, hey what are you doing." Id. The court refused, however, to consider Plaintiff's offer of proof that he had, indeed, made an inquiry before using physical force. Consequently, the state court's determination of probable cause was made without the benefit of this evidence--evidence that the court, itself, admitted was very important to the proceeding. See id.
 
 
 92
 Accordingly, the state court's refusal to consider evidence crucial to the probable cause determination is yet another indication that the question of probable cause was not fully and fairly litigated, which is required for collateral estoppel to apply. See Josey, 14 F.3d 601, 1993 WL 476974, at ** 1-2 (finding, where magistrate had foreclosed cross examination on crucial issue of whether officer, from his vantage point atop a roof, could actually see drug transactions, that question of probable cause was not fully and fairly litigated as required for application of collateral estoppel). Therefore, the state court's probable cause determination should not be given preclusive effect in this instance.
 
 
 93
 For the foregoing reasons, the district court should not have granted summary judgment as to Plaintiff's malicious prosecution claim under Section 1983.[10]C. False Imprisonment/False Arrest
 
 
 94
 The district court further found that, because it had held in the context of Plaintiff's malicious prosecution claim that Defendants had probable cause to arrest Plaintiff for assault, Plaintiff could not prove lack of probable cause for purposes of his false imprisonment and false arrest claims. Thus, the district court also granted summary judgment as to these causes of action. The majority agrees with the district court that probable cause existed to arrest Plaintiff for assault.
 
 
 95
 As previously discussed, however, in the context of Plaintiff's malicious prosecution claim, there remain genuine issues of material fact as to whether Defendants lacked probable cause to arrest Plaintiff for assault. Accordingly, Plaintiff's claims for false arrest and false imprisonment should also survive summary judgment, as Plaintiff can still prove lack of probable cause for purposes of these claims.[11]
 
 D. 42 U.S.C. § 1985(3)
 Conspiracy
 
 96
 The district court dismissed Plaintiff's Section 1985(3) claim, finding a total absence of any evidence suggesting that Defendants discriminated against Plaintiff because of his race. The majority affirms on the basis that there is an absence of any evidence of a conspiracy to deprive Plaintiff of his constitutional rights. However, the record in this case provides sufficient support for the proposition that Plaintiff's Section 1985(3) conspiracy claim should survive summary judgment.
 
 
 97
 Plaintiff has testified that, in the process of being arrested, he was called a "nigger," a "drug dealer," and a "black MF." (J.A., Smith Dep., at 75.) Further, Defendants' counsel admits that officers Slagle, Line and Thornburg were the officers involved in effectuating the arrest. (See Defs./Appellees Br. at 45.) While Plaintiff admits that he is uncertain which officer said which specific racial slur, which is understandable given the circumstances of Plaintiff's arrest, a jury could reasonably infer from the evidence that these Defendants were all involved in the above-described harassment; and this harassment provides the basis for a Section 1985(3) claim.
 
 
 98
 The alleged racial slurs, standing alone, state an equal protection claim based on racially motivated verbal abuse and harassment. See Johnson v. Morel, 876 F.2d 477, 479, 482-84 (5th Cir.1989) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class. Johnson's claim appears to do so. He alleges that Morel humiliated and harassed him, and that the insults and harassment were explicitly racist."), overruled on other grounds, Harper v. Harris County, Tex., 21 F.3d 597 (5th Cir.1994). Similarly, the circumstances to which Plaintiff has testified are sufficient to establish a conspiracy to verbally harass Plaintiff, because of his race, in violation of Section 1985(3).
 
 
 99
 The standard for proving a civil conspiracy is as follows:
 
 
 100
 A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.
 
 
 101
 Hooks v. Hooks, 771 F.2d 935, 943-44 (6th Cir.1985); see Bell v. City of Milwaukee, 746 F.2d 1205, 1255-59 (7th Cir.1984) (applying civil conspiracy standards to Section 1985 claim). Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, and circumstantial evidence may provide adequate proof of conspiracy. Id. at 1255.
 
 
 102
 Here, Plaintiff has testified that he was victimized by racial slurs while his arrest was being effectuated. The three Defendants all participated in the arrest, and Defendants' counsel has not identified any other officers who participated in taking Plaintiff into custody. Thus, one can reasonably infer that one or more of these Defendants used the racial slurs. Furthermore, the record indicates that, with the possible exception of officer Thornburg, Defendants were all present throughout Plaintiff's being taken into custody and thus while the alleged harassment took place. (See J.A., Slagle Dep., at 154-55; J.A., Line Dep., at 178-79; J.A., Thornburg Interview, at 124.) Accordingly, a reasonable inference can be drawn from Defendants' joint participation in the harassment that these Defendants shared in a single plan to harass Plaintiff because of his race, and shared in the general conspiratorial objective.
 
 
 103
 The majority argues that "the circumstances evince an occurrence of events much too quick to suggest that a conspiracy to deprive the plaintiff of his constitutional rights on the basis of his race was orchestrated." (Op. at 1078.) Yet, the circumstances do not negate the opportunity to form a conspiracy. To begin, it is unclear from the record how long it took Defendants to take Plaintiff into custody and at which points the verbal harassment occurred. Furthermore, it would have only taken a matter of seconds for Defendants to form a conspiracy to verbally harass Plaintiff on the basis of his race. Without the benefit of the truth-seeking devices of confrontation and cross-examination available at trial, both sides are left to speculate regarding whether the action of these Defendants, who admittedly acted in concert and who allegedly subjected Plaintiff to racial slurs, was the product or result of a conspiracy.
 
 
 104
 For the foregoing reasons, Plaintiff has come forward with enough evidence of a Section 1985(3) conspiracy to survive summary judgment.
 
 E. Qualified Immunity
 
 105
 Finally, there are issues pertaining to qualified immunity that must also be addressed. Firstly, the majority contends that "even if [they] were to assume that a warrantless search of the vehicle on private property was unlawful under the Fourth Amendment, [they] would conclude that the officers' reasonable mistake of fact in presuming that the property was public would be protected by qualified immunity." Id. at 1076. However, the majority's qualified immunity argument depends on there being probable cause to search in the first place; and, as previously discussed, there remain issues of fact which preclude a finding of probable cause. Obviously, the absence of probable cause affects the majority's qualified immunity analysis.
 
 
 106
 Secondly, Defendants' counsel argues that, "even if the court finds that the district court erred in its findings that Plaintiff's constitutional rights were not violated, this court should nonetheless affirm the judgment of the district court based upon qualified immunity." (Defs./Appellees Br. at 50.) However, summary judgment based on qualified immunity is not appropriate in this instance.
 
 
 107
 When a defendant moves for summary judgment based on qualified immunity, the plaintiff must: 1) identify a clearly established right alleged to have been violated; and 2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right. Pray v. City of Sandusky, 49 F.3d 1154, 1158 (6th Cir.1995). Plaintiff has alleged that his Fourth Amendment rights were violated when Defendants searched his vehicle without a warrant. At the time that Plaintiff's vehicle was searched, the law was clearly established that Defendants were required to have probable cause to conduct a warrantless search of the vehicle. See United States v. Wright, 16 F.3d 1429, 1437 (6th Cir.) ("If a vehicle is capable of use on the public roads, then a warrantless search of the vehicle does not violate the Fourth Amendment as long as the officers have 'probable cause to believe that the vehicle contains evidence.' " (quoting United States v. Duncan, 918 F.2d 647, 653 (6th Cir.1990), cert. denied, 500 U.S. 933, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991))), cert. denied, 512 U.S. 1243, 114 S.Ct. 2759, 129 L.Ed.2d 874 (1994); California v. Carney, 471 U.S. 386, 394, 105 S.Ct. 2066, 2071, 85 L.Ed.2d 406 (1985) ("Under the vehicle exception to the warrant requirement, '[o]nly the prior approval of the magistrate is waived; the search otherwise [must be such] as the magistrate could authorize.' ").
 
 
 108
 As previously discussed, Plaintiff has established, for purposes of summary judgment, that the search was conducted without probable cause. Hence, the question is whether Defendants reasonably could have thought they possessed probable cause to search Plaintiff's vehicle. See Jeffers v. Heavrin, 10 F.3d 380, 383 (6th Cir.1993) (Keith, J., concurring in part and dissenting in part) ("Thus, in deciding whether Heavrin has qualified immunity, this Court must consider whether in the 'totality of the circumstances' known to Heavrin, she reasonably could have thought she possessed probable cause to arrest Jeffers.").
 
 
 109
 For the reasons discussed above, the objective facts known to the officers, in the totality of the circumstances, do not reasonably suggest probable cause to search Plaintiff's vehicle. A reasonable police officer would have recognized that the facts were far too consistent with an owner's normal use of his vehicle and thus would have investigated further before conducting a search of the vehicle. See id. at 383-84 ("A reasonable officer ... would not arrest an individual without examining information available under the totality of the circumstances.").
 
 
 110
 Plaintiff has, as previously discussed, also established for purposes of summary judgment that his Fourth Amendment rights were violated when he was arrested for assault without probable cause. At the time of his arrest, the law was clearly established that an arrest must be supported by probable cause. See id. at 383. Thus, our consideration is whether Defendants reasonably could have thought they possessed probable cause to arrest Plaintiff.
 
 
 111
 Under the circumstances described by Plaintiff, Defendants could not have reasonably believed that Plaintiff's justification defense would not apply. Construing the evidence in Plaintiff's favor, Defendants were aware of the following objective facts. The lawfulness of their search of Plaintiff's vehicle was, at least, questionable. Officer Thornburg was in plain clothes while he was searching the vehicle, and his police insignia was obscured to Plaintiff because Thornburg had his back to the seat. The area was not visibly occupied by police, and it was at night and there was an intruder in Plaintiff's car. Plaintiff called out before he used minimal force to remove officer Thornburg from his vehicle. Under these facts, a reasonable police officer would assume that Plaintiff's justification defense applied and, accordingly, that probable cause to arrest Plaintiff for assault was lacking.
 
 
 112
 For the foregoing reasons, there are genuine issues of material fact which make summary judgment inappropriate.[12]
 
 III.
 
 113
 In view of the factual circumstances involved in this matter, the majority's decision to affirm the district court and deny Plaintiff an opportunity to bring his allegations of violations of his civil rights to trial is disturbing, to say the least. The majority, by its decision in this matter, indicates a willingness to ignore serious allegations of police misconduct motivated by race, and to disregard or distort factual allegations that are genuinely in dispute. Indeed, the majority's position in this matter seems to be predicated, in part, on an undue reliance on police testimony that crime is running rampant in the predominantly African-American housing developments of the City of Knoxville. The stereotypical belief that the incidence of crime is disproportionately high in neighborhoods occupied by racial minorities could, if acted upon, result in a failure by the courts to enforce civil rights laws, where it is alleged that they have been breached in minority communities, with the same vigor that such laws are enforced elsewhere in our society. In the instant case, the majority's refusal to permit Plaintiff to have his day in court is particularly distressing in light of the serious allegations of police misconduct and the use of vile racial slurs by police officers. I therefore dissent from the majority's opinion and would reverse the judgment of the district court.
 
 
 
 [1]
 Plaintiff is African-American and a professional football player with the New York Giants
 
 
 [2]
 The parties dispute whether the windows were rolled down and whether the music was loud enough to be heard outside of the car
 
 
 [3]
 Officer Thornburg alleges plaintiff also struck him in the head several times. However, because plaintiff denies striking him and admits to only grabbing Thornburg by the shirt and pants, we view the evidence in the light most favorable to plaintiff. There is no material issue of fact that plaintiff grabbed Thornburg by the shirt and pants and pulled him from the car
 
 
 [4]
 Plaintiff moved for a non-suit of his claims against defendants Claiborne, Trentham, and Fortner. The District Court denied plaintiff's motion to take a non-suit against these defendants because it ruled against plaintiff on the merits of the motion for summary judgment. The court also dismissed with prejudice the state claims against these three defendants because there was no evidence Claiborne, Trentham, or Fortner were involved in the search of plaintiff's car or in plaintiff's arrest and subsequent prosecution
 Plaintiff's notice of appeal indicates he has appealed from the dismissal of his claims against these defendants; however, plaintiff has not addressed the liability of these defendants in his brief. Plaintiff has, therefore, waived the issue on appeal. We affirm the District Court's dismissal of the claims against these defendants for the further reason that plaintiff failed to introduce any evidence that Claiborne, Trentham or Fortner were involved in the search, arrest, or prosecution at issue.
 Accordingly, when referring to defendants in the balance of this opinion, we refer to defendants Thornburg, Slagle, and Line.
 
 
 [5]
 Defendants do not appeal from the remand order; thus, plaintiff has viable claims for assault and battery pending in state court
 
 
 [6]
 The District Court ruled that plaintiff's complaint did not sufficiently plead a federal excessive force claim and plaintiff has not appealed from that determination
 
 
 [7]
 In addition to his claim for false arrest, plaintiff brings a claim for false imprisonment for the imprisonment incidental to the arrest
 
 
 [8]
 Plaintiff contends that he yelled out to the individual in his car while he was running towards it; however, Officer Thornburg testified that he did not hear plaintiff yell anything to him
 
 
 [9]
 Because we conclude that there was probable cause to arrest plaintiff and thus no false arrest, plaintiff's claim of false imprisonment was properly dismissed as well
 
 
 [10]
 The dissent contends that the record reveals Smith did not avail himself of a full adversary proceeding. Quite to the contrary, the record establishes that Smith's counsel arrived at the preliminary hearing ready to try the case. During a discussion on July 1, 1994, between Smith's counsel and the prosecutor regarding whether the court would conduct a preliminary hearing or trial on that day, Smith's counsel indicated, "[w]e would offer to try the case at this point." J.A. 195. While the parties ultimately agreed that a preliminary hearing would be held rather than a trial, Smith's counsel framed the issue to be decided during his opening as "whether or not the State can establish probable cause that an unlawful touching of the officer occurred and to negate by probable cause the defense that Mr. Smith was acting as he reasonably believed necessary to terminate the officer's trespass into his vehicle." J.A. 196. While Smith's counsel did not call all of the individuals who witnessed the events in question, Smith's counsel did call Officer Thornburg, Smith, Smith's father, and an investigator from his office. In fact, contrary to established procedures, Smith's counsel was permitted to recall Thornburg after Thornburg and Smith's father had testified. The court did so because Smith's counsel asserted that recalling Thornburg "[g]oes directly to probable cause," and because the court "pretty much want[ed] to hear what each side ha[d] to say generally." J.A. 208
 The dissent further contends that Smith was unable to fully and fairly litigate the probable cause issue because the court refused to hear evidence regarding Smith's justification defense. Specifically, Smith's counsel sought to introduce evidence that Smith, while running toward his car, yelled, "hey, hey what are you doing." The record reveals, however, that the court did not consider this evidence purporting to support the defense because Smith's counsel failed to apprise the court of the evidence until the judge announced and explained his decision. Under these circumstances, the court properly declined to hear evidence that was not introduced through an examination of a witness. Furthermore, while the dissent asserts the court admitted that the evidence was "very important" to the proceedings, our reading of the exchange between the court and Smith's counsel suggests that the court was merely attempting to explain to Smith's counsel that it was very important to introduce the evidence through a witness, rather than simply bringing it to the court's attention when the court was issuing its decision, in order that the witness from whom the testimony was elicited could be cross-examined.
 We, therefore, disagree with the dissent's contention that Smith did not have a full and fair opportunity to litigate the probable cause issue at his preliminary hearing.
 
 
 [11]
 There is no evidence they were uttered by Thornburg, Slagle or Line
 
 
 [12]
 In view of our disposition of plaintiff's case against the individual defendants, we need not address the liability of the City of Knoxville. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986)(a claim against a municipality for inadequate training and supervision under § 1983 cannot be maintained where there has been no constitutional violation by the persons supervised)
 
 
 [1]
 The majority correctly asserts that Plaintiff has waived the issue of Defendants Claiborne's, Trentham's, and Fortner's liability; in addition, Plaintiff has failed to introduce any evidence that these Defendants were involved in the search, arrest, or prosecution at issue. Accordingly, the term "Defendants" within this opinion refers only to Defendants Thornburg, Slagle, and Line
 
 
 [2]
 Defendants have proffered the following inconsistent explanations for why this vehicle appeared suspicious and, therefore, was searched. Defendant Thornburg stated the following in his August 5, 1994, interview with the Internal Affairs Unit:
 This car, the engine was running, the headlights were on, the stereo was turned up and thumping real loud, the windows were partially down. And this is a 35, 40 thousand dollar car sitting in Green Hills, where all this..[sic] you know, this is a high drug trafficking area. I worked over there when I was in patrol. I personally have recovered a lot of stolen cars from Green Hills. And at 12:30 on a Friday night, that vehicle with the windows down and the engine running, didn't look right.
 (J.A., Thornburg Interview, at 124.) Defendant Thornburg further explained at Plaintiff's preliminary hearing:
 I was standing there, I was looking at a, probably a 92 or 93 Dodge Stealth, a $40,000 car, the engine was running, the windows were down, the headlights were on and the stereo was cranked all the way up.... I had worked this area before and I know Greenhill Apartments and I know that particular area, I personally have recovered a lot of stolen cars from that area. When I first saw the car, I immediately thought that it was stolen, that was my first belief. The second thing is is it was 12:30 in the morning, this is an apartment complex and the stereo was full blast.
 Id., Tr. Prelim. Hr'g, at 197.
 Defendant Slagle, however, gave the following explanation for the search in his August 5, 1994, Internal Affairs interview:
 The car they was at was a Dodge Stealth and seem like it was green. Motor was running, there was enough lights on it to land an airplane, shining under it, out of it everywhere. And our first impression, my impression I was sitting in the car, but my first impression was that it was the car the [arrested] subject was in cause the motor was running. He was arrested.. you know, within 10 feet of it. So we checked car [sic]....
 Id., Slagle Interview, at 132. Later, however, in his January 24, 1996, deposition, Defendant Slagle gave the following explanation for the search:
 The first thing I would say is the car parked there, that new, had the lights on, motor running, radio blaring is probably, 99.99 percent of the time a stolen vehicle.... They park them in there all the time, they leave the motor running. That's a dumping grounds for them, stolen cars. They steal cars out of there, but you find a bunch of stolen cars in there.... Vehicle is running, motor is running. You can't leave a motor vehicle running in a high crime area anyway.... They will steal it.
 Id., Slagle Dep., at 155.
 Similarly, Defendant Line offered, in his August 14, 1994, Internal Affairs interview, the following explanation for why the vehicle was searched:
 The radio on the vehicle was up real loud. We thought it was the subject we took down's vehicle 'cause he was standing directly next to it. The engine was running. Officer Thornburg looked inside the vehicle, I assume to see if there's any contraband or weapons laying in plain view. The windows were down, both windows were down.
 Id., Line Interview, at 139. Yet, Defendant Line later stated in his January 24, 1996, deposition:
 There was a green Dodge Stealth parked in the parking lot. It wasn't pulled into the parking lot like you would pull in, it was parked at an angle, and the engine was running and the stereo was real loud. You couldn't really hear what was going on for the music in the stereo.... The windows were down.... They were taking the subject into custody. We walked over the vehicle to check it to see like if it was stolen. Just like everyone else said, it is a high crime area to recover stolen vehicles.
 Id., Line Dep., at 177.
 
 
 [3]
 Plaintiff was not worried about leaving his vehicle in this condition because he does not share Defendants' view of the Green Hills Apartments. That is, to Plaintiff, the Green Hills Apartments is not a "high crime area" or "a drug trafficking area"; Plaintiff has lived in the area all of his life and contends that the only crime he has personally experienced is his being assaulted by Defendants. (See J.A., Smith Dep., at 61, 63.)
 
 
 [4]
 The next day, Plaintiff was treated at the emergency room for an injured shoulder and a busted lip
 
 
 [5]
 Apparently, a "roller" is a term for a drug dealer. (See J.A., Smith Aff., at 47.)
 
 
 [6]
 Defendants' apparent lack of good faith should be taken into consideration because it creates doubt as to Defendants' present assertions about the alleged circumstances that form the basis for probable cause. Good faith is not considered, in this instance, for purposes of invalidating the search based on pretext; for purposes of the Fourth Amendment analysis, we are concerned with whether the facts known to the officers at the time of the search supported probable cause and not with the officers' subjective motivations
 
 
 [7]
 As previously explained, Defendant Thornburg may have been unlawfully interfering with Plaintiff's property; thus, contrary to the majority's assertion, Section 39-11-614(a) is still applicable
 
 
 [8]
 The majority points out that Defendant Thornburg testified that he did not hear Plaintiff yell anything to him; however, drawing all inferences in Plaintiff's favor, a jury could reasonably find that Defendants heard Plaintiff's screams
 
 
 [9]
 Defendants' counsel contends that Plaintiff's malicious prosecution claim was properly dismissed for an additional reason that was not reached by the district court because the court found probable cause for Plaintiff's prosecution. Defendants' counsel argues that "the allegations of plaintiff's complaint and the proof in the Summary Judgment record fail to establish a prosecution that is so egregious as to amount to an injury of constitutional dimension or shock the conscious." (Br. Defs./Appellees at 36.)
 Plaintiff's malicious prosecution claim is, however, cognizable under Section 1983 in this instance. That is, Plaintiff alleges a "misuse of a legal proceeding ... so egregious as to subject the aggrieved individual to a deprivation of constitutional dimension." Dunn v. Tenn., 697 F.2d 121, 125 (6th Cir.1982), cert. denied, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983). Here, as in Dunn, Plaintiff claims, and has presented proof, that he was arrested and prosecuted for attempting to exercise his Fourth Amendment right to be free from unreasonable searches and seizures. In Dunn, the plaintiff was prosecuted, for interfering with police officers in the performance of their duties, after standing in his doorway to prevent police from conducting a warrantless search of his home. In this instance, Plaintiff was prosecuted for assault after physically removing from his vehicle a police officer that Plaintiff alleges was conducting an unlawful search. According to Dunn, one adequately states a Section 1983 cause of action based on malicious prosecution, where one alleges that he was prosecuted for exercising his constitutional rights. See id. at 126 ("[T]he complaint ... allege[s] that defendants ..., acting under color of law, deprived plaintiff of his constitutional right under the Fourth Amendment, as incorporated in the Fourteenth Amendment, to be free from unreasonable searches and seizures. They did so by arresting and prosecuting [the plaintiff] because he attempted to exercise that right.... We hold that he has adequately stated a cause of action [under Section 1983]."); Braley v. City of Pontiac, 906 F.2d 220, 227 (6th Cir.1990) ("In allowing the plaintiff [in Dunn ] to proceed with his § 1983 action under a malicious prosecution theory, this court held that the plaintiff had been prosecuted for exercising his fourth amendment right to be secure from unreasonable searches.").
 
 
 [10]
 The majority contends that the record establishes that Plaintiff availed himself of a full adversary proceeding. They emphasize that Plaintiff's counsel "arrived at the preliminary hearing ready to try the case." (Op. at 1077 n. 10.) Yet, while Plaintiff's counsel may have been prepared to try the case, once the proceeding was converted into a preliminary hearing, counsel had no incentive to reveal his entire defense and to permit the prosecution a dry run of its case; and the record indicates that Plaintiff's counsel, for good reason, presented only a skeletal version of Plaintiff's defense
 The majority also emphasizes that Plaintiff's counsel, during his opening, framed the issue to be decided as whether the state could establish probable cause that an assault had occurred and negate by probable cause Plaintiff's justification defense. Clearly, these remarks are merely prefatory statements explaining the purpose of a preliminary hearing--i.e., to contest probable cause. These statements provide no indication whatsoever of the extent to which Plaintiff actually contested probable cause. The majority points out that, in addition to calling Plaintiff and Defendant Thornburg as witnesses, Plaintiff's counsel called Plaintiff's father and an investigator from counsel's office. However, Plaintiff's father did not witness the event and was mainly called for the purpose of testifying to Plaintiff's good character; and the investigator was called solely for the purpose of introducing a transcript and tape recording of the police's broadcast regarding the incident. Hence, neither of these witnesses suggest a comprehensive effort by Plaintiff's counsel to contest probable cause.
 Finally, the majority asserts that the state court properly declined to hear evidence essential to Plaintiff's justification defense because it was not introduced through examination of a witness. In this instance, however, Plaintiff's counsel made an offer of proof in response to the state court's statement that it felt the justification defense had not been supported because there was no evidence that Plaintiff had made an inquiry before resorting to force. In view of the exigent circumstances that existed at the time of the incident which led to Plaintiff's arrest, there is considerable doubt that Plaintiff should have been required, as a matter of law, to conduct an inquiry as a precondition to availing himself of the justification defense. In any event, when the state court judge advised Plaintiff's counsel at the preliminary hearing of the need to satisfy the court's precondition for Plaintiff's use of the justification defense, the court's refusal to entertain Plaintiff's offer of proof deprived Plaintiff of a full and fair hearing for collateral estoppel purposes. See Josey, 14 F.3d 601, 1993 WL 476974, at ** 1-2, where this Court refused, in a subsequent Section 1983 action, to afford preclusive effect to a magistrate's finding of probable cause at a preliminary hearing, where the magistrate had not permitted defense counsel to attack the police officer's testimony regarding probable cause and had thus found probable cause without considering this evidence.
 
 
 [11]
 I also reject Defendants' counsel's assertion that Defendants also had probable cause to arrest Plaintiff for resisting stop, frisk, halt, arrest or search, and for disorderly conduct. It is clear, based upon my explanation as to why Plaintiff can still prove that there was not probable cause to arrest Plaintiff for assault, that Plaintiff could also prove that Defendants did not have probable cause to arrest Plaintiff for these other violations
 
 
 [12]
 The majority does not address the liability of the City of Knoxville because of its disposition of Plaintiff's case against the individual Defendants. Similarly, the district court granted the City of Knoxville's motion for summary judgment because of its disposition of the case against the individual Defendants. Since Plaintiff's claims against the individual Defendants should survive summary judgment, Plaintiff should also be permitted an opportunity to prove his claims against the City of Knoxville