William E. RUECKERT, Plaintiff,

v.

CITY OF FLINT, et al., Defendants.

No. 96–CV–74252–DT.

United States District Court,
E.D. Michigan,
Southern Division.

March 6, 1998.

Steven P. Iamarino, Grand Blanc, MI, for Plaintiff.

Barry A. Wolf, Flint, MI, for Defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Section 1983/defamation/battery/false imprisonment case is presently before the Court on Defendants' Motion for Summary Judgment. Plaintiff has responded to Defendants' Motion, to which response Defendants have replied. The parties also filed supplemental briefs in support of their respective positions on this matter. Additionally, after the Court heard oral argument on the Mo-

tion, the parties submitted for the Court's consideration the full transcripts of depositions referenced in their respective Briefs.

Having reviewed and considered the parties' Briefs and supporting documents, and having heard the oral arguments of counsel, the Court is now prepared to rule on Defendants' Motion. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

At approximately 10:30 p.m. on August 15, 1995, Flint Police Officers Karl Petrich and Ronnie Summers were directed by police dispatch to investigate a "suspicious vehicle" parked in the driveway of a home on Sunridge Drive in Flint, Michigan. According to the dispatch, neighbors of the Sunridge home said that they knew the occupants were not home. The neighbors had reported that a conversion van with two occupants in it pulled into the driveway, turned off the lights, after which the driver and passenger retreated to the rear of the van. No one ever exited the van and the neighbors, concerned that something was amiss, called 911.

When Officers Petrich and Summers arrived on the scene, they observed that the van had its blinds pulled down on the rear and side windows. The officers tapped on the front windshield and shined their flashlights into the interior of the van. They both saw Plaintiff William Rueckert laying on the fold-out bench/bed in the back of the van with a blonde female.[1]

According to the police reports, when the officers lit up the interior of the van with their flashlights, Plaintiff jumped up, appeared to look startled, and went to the van's side door. He exited the van and when asked what he was doing at that location, he told the officers that he was waiting for his accountant who resided at the Sunridge ad-

dress because he had to get from the accountant tax papers which had to be filed by midnight that night. He showed the officers his accountant's business card and when he did so, the officers observed that his hands were shaking.

Officer Petrich also stated that when Plaintiff exited the van, he observed a "bulge" in Plaintiff's pants which he believed to be a full or partial erection which led Petrich to believe that Plaintiff had been sexually involved with the female in the van. However, Petrich also believed Plaintiff's explanation as to why he was at the Sunridge residence, and believing that what he thought was sexual activity was between two consenting adults, and not wanting to cause anyone undue embarrassment, he directed Officer Summers to leave the scene with him.

When the officers got back to the patrol car and started to pull away, Petrich commented to Summers that the woman in the van must have been a good looking female because Plaintiff had an erection. (Summers testified that he did not look up and down Plaintiff's person so he did not notice a bulge in his pants.) Summers told Petrich that based upon what he saw when they had shined their flashlights into the van, the blond female in the van was a six or seven year-old child. Upon hearing that, Petrich, who was driving, stopped the cruiser and returned to the scene because he was fearful that there might be ongoing sexual contact between an adult male and female child. According the officers, they only drove a short way down the street and were back on the scene "within a minute or two".[2]

When the officers returned to the scene, they went to the side door of the van. Plaintiff exited the van and Petrich asked who was with him in the van. According to the offi-

---

1. Although in his Response Brief, Plaintiff denies that he was laying in the folded-down back seat bench-bed and contends that he was sitting in one of the front captain's seats, Plaintiff's Brief contentions are not supported by the record evidence in this case. At his deposition, Plaintiff testified, "I don't actually know where I was when they tapped on the window." [Rueckert Dep. p. 26.] However, both Officer Petrich and Officer Summers testified that they found Plain-

tiff laying in the fold-down bed in the back of the van.

2. Plaintiff claims in his Response Brief that it was 15 to 20 minutes later that the officers returned, but, again, this contention is not supported by Plaintiff's own deposition testimony in which Plaintiff stated he did not know how long it was before the officers returned the second time. [See Rueckert Dep. pp. 31–32.]

cers, Plaintiff identified the girl who was with him (now known to be Lauren Castle) as his daughter.[3]

Officer Petrich wanted to separate Plaintiff from the girl so he could conduct a short investigation to ensure that the child was not being assaulted or endangered. He therefore told Plaintiff that he wanted him to sit in the back seat of the patrol car. According to Officer Petrich, he asked Plaintiff if he had any weapons on him and Plaintiff responded that he did not have a weapon on his person but that there was a loaded gun in the van in a Tupperware box with his CCW permit.[4]

After placing Plaintiff in the squad car, Petrich went to the van, found the Tupperware container referred to by Plaintiff, opened it and found a .357 magnum loaded with six live rounds. Also in the box was Plaintiff's wallet and a large roll of cash. Petrich returned to the cruiser with the gun and the wallet. He handed the wallet to Plaintiff and asked him to produce his CCW permit. Plaintiff withdrew the permit from his wallet and handed it to Petrich. The permit was stamped "restricted" on the front, and on the back, stamped in bold red type, it stated "Void if found loaded in a vehicle or motorboat."

Petrich then went to speak with the child, Lauren Castle, who was with Officer Summers. Lauren told the officers that she was seven years old. She said she had been sleeping, and in response to Officer Petrich's question, she said there had been no kissing with Plaintiff. The officers observed no overt signs that the child had been sexually assaulted.

Petrich then returned to the patrol car to call a supervisor to the scene because he was uncertain as to how to proceed. Shortly thereafter, a police sergeant, Sergeant Brown, arrived on the scene. After being informed as to the facts, Brown, although unsure as to whether there might be a criminal sexual conduct complaint, ordered Plaintiff arrested for carrying a concealed weapon in violation of his CCW permit. He radioed for a female officer to attend to Lauren Castle and he ordered Mr. Rueckert's van towed to the police department. (The van was to be considered a crime scene if there was to be any criminal sexual conduct charges filed and there was no one at the scene capable of driving or safeguarding the van where it was.)

At the police station, Rueckert was interviewed by Sergeant Ed Gilmore from the detective bureau. The police were also able to contact Paula Castle, Lauren's mother, who came to the station to pick up Lauren. After speaking with Paula Castle, it was decided that no action for CSC charges would be taken at that time. Sergeant Gilmore, however, did order Rueckert lodged at

---

**3.** According to Officer Petrich, it was not until later, when Rueckert was seated in the patrol car that Rueckert told him that Lauren was not really his daughter, but rather the daughter of his girlfriend. Plaintiff does not categorically deny that he originally identified Lauren as his daughter; rather, he merely stated that he did not think the issue of his relationship with Lauren came up. [See Rueckert Dep. p. 40.]

**4.** Plaintiff disputes that he told either of the officers about his gun in the car and claims that the first he knew that Petrich was aware of the gun was when the gun and permit were brought to him in the patrol car and he was asked if he was the owner. However, in Supplemental Briefs, both parties have submitted excerpts of the deposition of Judith Fick, a non-party witness, in which Ms. Fick testified regarding her conversation with Mr. Rueckert the day after his release from jail as follows:

Q: Did [Mr. Rueckert] ever say whether or not he told the police that he had a gun in the van prior to the police going into the van?

A: Yes; he did. Come to think of it he did say—they asked him, and he did tell them, yes; I do carry a gun.

Q: So he told you that the police asked him, do you have a gun?

A: Right.

Q: And he told the police, yes; I do?

A: Yes.

Q: Did he tell them it was in the van?

A: Did he tell them what?

Q: That it was in the van?

A: Oh, yes. That he was carrying it; yes.

[Fick Dep. p. 9.]

Notwithstanding Ms. Fick's and Officer Petrich's testimony, for purposes of this Motion the Court will accept Plaintiff's version that he did not tell either of the officers about the gun before Officer Petrich went to search the van and that Officer Petrich found the gun himself during the search.

the Genesee County Jail for carrying a concealed weapon.

Rueckert was transported to the jail between 2 a.m. and 3 a.m. on August 16, 1995. Later that day, Detective Sergeant Barbara Stevens, who had been assigned Reuckert's case, prepared the necessary paperwork and presented the papers to Assistant Genesee County Prosecutor Blanchard for the issuance of an arrest warrant. Assistant Prosecutor Blanchard declined to issue a warrant and advised Sergeant Stevens to release Rueckert pending further investigation. Rueckert was released at approximately 3:00 p.m. August 16th.

While he was held in the jail holding area, Rueckert claims he saw two men he knew from the Birch Run area. He claims that he told them that the police suspected that he was acting inappropriately with Lauren Castle. After his release, Rueckert told his grocery store employees, his mother, and the Birch Run Chief of Police of his arrest. News of Rueckert's arrest was never published or broadcast by any news media. Other than the people Rueckert personally told, no one else ever said anything to him nor has he heard rumors regarding his arrest. He has never alleged that anyone from the Flint Police Department informed the news media or anyone from Birch Run about his arrest or the incidents of August 15–16, 1995.

On August 15, 1996, Plaintiff initiated the instant action in Genesee County Circuit Court. The City of Flint timely removed the action to federal court.

In his Second Amended Complaint, Plaintiff has alleged four counts—a federal § 1983 claim for "unconstitutional search, seizure and retention of property", and three state law counts for defamation, battery and false imprisonment.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in or-

---

**5.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

der to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these factors in deciding Defendant's Motion for Summary Judgment in this case.

## B. *PLAINTIFF'S § 1983 CLAIMS*

Plaintiff has asserted a claim of deprivation of constitutional rights under 42 U.S.C. § 1983, contending that because no probable cause existed for the police officers' investigation, seizure of him and search of his van, the search, seizure, and detention of his property (i.e., his van) was unconstitutional. In his Complaint, Plaintiff alleges that:

(1) No probable cause existed for the Plaintiff to have been initially seized from his vehicle, and deprived of his freedom of movement, without a warrant;

(2) No probable cause existed for Defendant Officers Petrich and/or Summers to have opened the closed container in Plaintiff's vehicle and to have removed any of Plaintiff's personal property from the closed container, without first obtaining a ·warrant; and

(3) No probable cause existed for the Plaintiff's arrest and jailing, under the facts and circumstances of this case.

[See Plaintiff's Second Amended Complaint, ¶¶ 67–69, 84.]

Defendants argue that they are insulated from liability on Plaintiff's § 1983 unconstitutional search and seizure claims by application of the doctrine of "good faith" or "qualified" immunity.

## QUALIFIED IMMUNITY

■ Under the doctrine of qualified immunity, government officials acting in their official capacities are protected from being sued in their individual capacities for damages if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Greene v. Reeves*, 80 F.3d 1101, 1104 (6th Cir.1996), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The Supreme Court has made it clear that the qualified immunity doctrine is intended to provide law enforcement officers broad protection and to insulate from suit "all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed*, 500 U.S. 478, 494, 111 S.Ct. 1934, 1944, 114 L.Ed.2d 547 (1991), quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). In *Malley v. Briggs*, in reviewing a case where the plaintiffs alleged that probable cause was not established—as does Plaintiff Rueckert here—the Court stated that application of the doctrine will be denied only if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that probable cause existed, "but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.*

In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court squarely addressed the issue of qualified immunity as it applies to determinations of probable cause to conduct a search. In that case, the Court emphasized that it simply does not follow immediately from the premise that because the right to be free from warrantless searches absent probable cause or exigent circumstances is "clearly established" under the Fourth Amendment, that all law enforcement searches not supported by probable cause or exigent circumstances must be deemed objectively legally unreasonable for purposes of application of the qualified immunity doctrine. The Court explained,

We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.... The same is true of their conclusions regarding exigent circumstances.

It follows from what we have said that the determination **whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials**.... The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.

107 S.Ct. at 3039–40.

■ The test for qualified immunity, thus, is one of "objective reasonableness"—whether an officer acting under the circumstances at issue reasonably could have believed that his action would not violate the constitutional rights asserted. *Malley v. Briggs, supra; Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ "Reasonableness" is to be assessed from the perspective of the reasonable officer on the scene, rather than with the benefit of hindsight. *See Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); *Washington v. Newsom,* 977 F.2d 991, 994 (6th Cir.1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1848, 123 L.Ed.2d 472 (1993) (Police conduct is examined to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their intent or motivation ... judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.,* quoting *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)); *Pray v. City of Sandusky,* 49 F.3d 1154, 1158 n. 3 (6th Cir.1995) (reasonableness must be judged "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). *Cf., Bills v. Aseltine,* 52 F.3d 596, 603 (6th Cir.1995), *cert. denied,* 865 U.S. 516, 116 S.Ct. 179, 133 L.Ed.2d 118 (1995); *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 999 (6th Cir.1994).

Guided by the foregoing authorities, the Sixth Circuit has determined that when, as in this case, a defendant moves for summary judgment based on qualified immunity, the plaintiff must (1) identify a clearly established right alleged to have been violated; *and* (2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right. *Greene v. Reeves, supra,* 80 F.3d at 1104, quoting *Pray v. City of Sandusky, supra.*

Application of the qualified immunity doctrine requires the Court to make an independent assessment of the reasonableness of the officer's conduct. *Goodwin v. Metts,* 885 F.2d 157 (4th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990); *Jeffers v. Heavrin,* 10 F.3d 380, 381 (6th Cir.1993) ("reasonableness is a question of law to be decided by the trial court.") *See also, Greene v. Reeves, supra* ("*Hunter* [*v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)] established that the determination of whether qualified immunity applies to an officer's judgment as to probable cause is one for the court, not the jury to make." 80 F.3d at 1104–05); *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988) ("The question of whether qualified immunity attaches to an official's actions is purely a legal question for the trial judge to determine prior to trial.")

In *Jeffers, supra,* the defendant was a police officer assigned to search persons entering the Kentucky Derby. One of the persons searched by Defendant Heavrin was the plaintiff. Upon searching Jeffers, Heavrin found pills she believed to be unprescribed valium. Also assigned to the Derby were four undercover narcotics officers. However,

Heavrin did not consult with them, and instead, acting upon her own judgment, she ordered the plaintiff arrested. After Jeffers was arrested, it was discovered that the pills were not valium. Even though it would have been obvious to the undercover narcotics officers that the drugs were not valium, the Sixth Circuit upheld the district court's grant of qualified immunity in that case explaining,

> In hindsight, the information on which Heavrin acted was negligently secured, and her decision to arrest Jeffers rather than deny entry was questionable. However, the doctrine of qualified immunity encompasses such judgmental errors.

*Id.*

■ Turning to the instant action, as an initial matter, the Court notes that Plaintiff does not challenge the officers' initial contact with him in responding to the 911 complaint from a neighbor of a suspicious vehicle in the driveway at 3825 Sunridge. Further, Plaintiff does not dispute that it was reasonable for the officers to return to the van a second time after they had put together the information each had separately noted concerning Rueckert and his female companion, i.e., Officer Petrich's observation of an erection on Mr. Rueckert and Officer Summer's observation that the female Rueckert had with him in the van was a six- or seven-year-old girl. What Plaintiff does challenge, however, is the officers' subsequent detention of him in the patrol car and the search of his van and the Tupperware container he kept along side the driver's seat in which his gun was found. Plaintiff contends that the officers lacked probable cause to detain him and search his van and the Tupperware container.

Initially, the Court observes that Plaintiff mischaracterizes the inquiry in this case as being one to determine whether there is a question of fact as to the existence of probable cause. Instead, the proper inquiry is whether there is a question of fact as to whether a reasonably competent officer could have concluded that probable cause existed. *See Jag v. City of Warren*, 944 F.Supp. 606, 609 (E.D.Mich.1996). As the court in *Jag* noted, "[this] distinction is subtle but significant." *Id.* As such, it is possible that a defendant may be entitled to qualified immunity if acted reasonably at the time even if it is later determined that there was insufficient probable cause for conviction. *Id.*

That being said, the Court finds that Plaintiff in this case is unable to create an issue of material fact as to the reasonableness of the officers' conclusion that probable cause existed. In making this determination, the Court accepts as true Plaintiff's allegations that he did not inform the officers that he had a loaded weapon in the van and that the officers found the gun in the Tupperware container on their own during their search of the van.

With respect to the detention of Plaintiff, it is undisputed that the officers clearly advised Rueckert that he was being detained while they conducted their investigation of possible criminal sexual conduct. The Supreme Court has explicitly determined that brief investigatory detentions, even those which rise to the level of a "seizure"[6] are constitutionally permissible if supported by a "reasonable, articulable suspicion" that the person detained was engaged in wrongdoing. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Court finds that the officers had a "reasonable, articulable suspicion" of criminal sexual conduct behavior based upon their observations of (1) Mr. Rueckert's apparent erection; (2) Rueckert lying in the fold-down bed in the back of the van with his arm around a six or seven year-old girl at 11:00 at night; (3) Rueckert initially identifying Lauren as his daughter but then subsequently correctly identifying her as his girlfriend's daughter.[7]

---

**6.** The Supreme Court has identified a "seizure" as occurring at that point in time when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

**7.** As noted *supra*, although Plaintiff denies in his Brief that he ever identified Lauren as his daughter, that denial is not borne out by his deposition testimony—which is the record evidence that the Court must consider. In his deposition, Plaintiff merely stated that he did not recall the issue of

Therefore, the Court finds that the test of "objective reasonableness" is satisfied with respect to the detention of Plaintiff while the officers conducted their investigation.

With respect to the subsequent search of the van, the Sixth Circuit recently addressed the issue of probable cause in connection with a Section 1983 claim of deprivation of constitutional rights predicated upon the search of a motor vehicle and the subsequent arrest of the plaintiff based upon evidence discovered in a closed compartment of the vehicle during the search in *Smith v. Thornburg*, 136 F.3d 1070 (6th Cir.1998). In affirming the district court's grant of summary judgment in favor of the defendant police officers, the court delineated the following standards:

> Pursuant to the automobile exception to the warrant requirement, an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime. We define probable cause as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Determining whether probable cause existed at the time of the search is a "commonsense, practical question" to be judged from the "totality-of-the-circumstances." In determining whether probable cause exists, we may not look to events that occurred after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search.

136 F.3d at 1074–75 (citations and some punctuation omitted). *Cf., Greene v. Reeves, supra* ("As to searches... [t]he probable cause requirement ... is satisfied if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." 80 F.3d at 1106.)

Based on the foregoing, the question in this case, then, is whether, from the totality of the circumstances, the officers had reasonable grounds for believing at the time of the search that there was a fair probability that evidence of criminal sexual conduct would be found in the van. The Court concludes that in this case, the officers reasonably concluded that probable cause existed to search the van due to the facts known to the officers at the time. First, the officers observed a middle-aged man found lying in the back of a van with the blinds drawn with a very young girl who was not related to him a long way from home at 11:30 at night. Second, one officer saw that the man had an erection, and related this to the second officer. Although Plaintiff contends that any belief of sexual conduct between him and the girl could have been dispelled by talking to Lauren or her mother, the Court finds that where a minor child is involved and questionable circumstances are presented, it is wholly reasonable and, indeed, preferable, for the officers to err on the side of caution and pursue their investigation by searching the van for evidence of criminal sexual conduct. It was certainly reasonable for the officers to believe that some evidence of this conduct might be found in the van *and* in the Tupperware container. (It is well-settled that closed containers in motor vehicles can be searched without a warrant where the police have probable cause to search the vehicle, itself. *See United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)).

In this Court's view, when balancing the interests of the child and the interest of the community in protecting minors from criminal sexual conduct against the slight intrusiveness of the search of the van and the Tupperware container, the Court finds that

his relationship to Lauren ever coming up. The Sixth Circuit has long held that where the facts alleged in the plaintiff's pleadings are directly controverted in the evidence supporting the defendant's summary judgment motion and where the plaintiff's version of the facts is not presented in any deposition or affidavit on file, no issue of fact is deemed to exist and summary judgment is proper. *See R.E. Cruise, Inc. v. Bruggeman*, 508 F.2d 415, 416 (6th Cir.1975). *See also, Jag v. City of Warren, supra*, 944 F.Supp. at 610.

the officers acted reasonably. Clearly, given the potential for great physical and psychological harm to a child in this situation, it is not unreasonable for a police officer to want to fully satisfy himself that the child is in no danger and has suffered no harm. In fact, the Court believes the community would demand nothing less of an officer in these circumstances. The fact that the situation later, upon further investigation, turns out to be innocent is of no moment here. These probable cause/reasonableness determinations must be made from the officer's perspective at the time he made the decision to search. Therefore, the Court finds that the test of "objective reasonableness" is satisfied with respect to Plaintiff's claims concerning the search of his van and the Tupperware container in which his gun was found.

As for Plaintiff's arrest, once Officer Petrich found the loaded .357 magnum and the restricted CCW permit, probable cause clearly existed for Rueckert's arrest on the CCW violation.

· For all of the foregoing reasons, the Court finds that Defendants are entitled to the protection of qualified immunity, and therefore, Defendants' motion for summary judgment will be granted on Plaintiff's Section 1983 claims.

## C. STATE CLAIMS

### 1. False imprisonment and Battery

It is well-settled in Michigan that an arrest based on probable cause is sufficient to defeat a claim of false imprisonment, *Brewer v. Perrin,* 132 Mich.App. 520, 349 N.W.2d 198, 202 (1984).

Similarly, the use of reasonable force to effectuate an arrest defeats a battery claim based on nonconsensual touching. *Id.* Because the Court finds that probable cause existed for Plaintiff's arrest and there are no allegations of the use of "excessive force" by the officers in effectuating that arrest, the Court determines that Defendants are entitled to summary judgment on Plaintiff's false imprisonment and battery claims, as well.

Moreover, even if the Court were to find that Defendants are not entitled to

summary judgment on the merits of Plaintiff's false imprisonment and battery claims, the Court would nonetheless find summary judgment appropriate by application of state law governmental immunity. "Governmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified." *Id.* As discussed above in this Opinion and Order, the Court has found Defendants' actions entirely justified. Accordingly, summary judgment on governmental immunity grounds is also appropriate on these claims.

### 2. Defamation

Neither Defendants nor Plaintiff addressed the merits of Plaintiff's defamation claim in any of their briefs. However, it does not appear from the face of Plaintiff's Complaint or from Plaintiff's deposition testimony regarding this count that a legally cognizable defamation claim exists.

Plaintiff's defamation count is predicated upon only the following allegations:

"Plaintiff was treated and labeled as a "criminal" by virtue of the acts and omissions of Defendants Summers, Petrich and Gilmore... specifically involving the acts of detention, arrest, and actual jailing in a cell with other accused and/or known criminals."

"Plaintiff was caused to be seen by an individual associated with members of his business community, while under arrest and while being detained in a jail cell, at the Genesee County Jail."

[Second Amended Complaint, ¶¶ 50–51.]

In order to establish a *prima facie* cause of action for defamation under Michigan law, a plaintiff must prove each of the following elements:

a) a false and defamatory *statement* concerning plaintiff;

b) an unprivileged *communication to a third party;*

c) fault amounting at least to negligence on the part of the communicator; and

d) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publisher (defamation per quod).

*Morganroth v. Whitall,* 161 Mich.App. 785, 789, 411 N.W.2d 859 (1987).

 Being "**treated** like a criminal" and being "**seen**" by third parties while in jail do not amount to defamation. Further, the only fact of publication of record is Plaintiff's deposition testimony that he told his own mother, Paula Castle (Lauren's mother), a few of his co-workers and employees, and his friend, the Birch Run chief of police, that he was suspected of having acted improperly with Lauren Castle, and subsequently arrested and taken to jail. The Defendant police officers cannot be held liable for Plaintiff's "self-defamation", particularly in light of the fact that nothing that Plaintiff told his family, co-workers and friends about the police officers' suspicions or his arrest and detention was false.

The tort of "self-defamation" has not been recognized by the Michigan Supreme Court. Self-defamation was first addressed in Michigan in *Konkle v. Haven,* 140 Mich. 472, 103 N.W. 850 (1905). In that case, a letter was sent by the defendant to the members of a church board charging the church's pastor with immorality. The board members never made the letter public. The pastor subsequently read the letter to his congregation from the pulpit and resigned his position. He then sued the defendant based upon damage to his reputation predicated upon his reading of the letter to his congregation. At trial the jury found for the plaintiff. The Michigan Supreme Court reversed, explaining:

> There was no occasion for the publication of the letter to the plaintiff's congregation, or for his publishing the letter at all.... He chose to read it in the pulpit, and publish it to the members of his church and community. For this publication the defendants were not responsible, and the court should have directed the

jury as requested, that the defendants were not responsible for any damages resulting from the publication.

103 N.W. at 851–52.

It is true that the Michigan Court of Appeals once allowed a claim of "compelled" self-defamation in the context of an discharged employee's self-publication of the reasons given for her discharge to prospective future employers. *See Grist v. Upjohn Co.,* 16 Mich.App. 452, 168 N.W.2d 389 (1969). However, no court since *Grist* has done so. Indeed, the few jurisdictions which recognize the tort of "compelled" self-defamation do so only in the employer-discharged employee context. *See,* David P. Chapus, Annotation, *Publication of allegedly defamatory matter by plaintiff ("self-publication") as sufficient to support defamation action,* 62 A.L.R.4th 616, 1988 WL 546519 (1988). Courts dealing with the issue of self-publication by a defamed former employee have found that it should be foreseeable to the defendant-former employer that, in seeking a new job, the former employee would be compelled to communicate the defamatory reason given for his or her discharge. Therefore, according to this minority view,[8] it is reasonable under those limited circumstances to hold the former employer liable for damages sustained as a result of the plaintiff's self-publication of such defamatory statements. *Id.*

 It is clear from the foregoing discussion, that Plaintiff's "self-publications" in this case do not fit within the narrow exception to the general rule that one who communicates defamatory matter directly to the defamed person, who himself communicates it to a third party, has not "published" the matter to a third party and, therefore, cannot be held liable for damages. *See* Restatement (Second) of Torts, § 577.[9]

---

**8.** Only 16 jurisdictions have recognized this tort. *See, Layne v. Builders Plumbing Supply Company, Inc.,* 210 Ill.App.3d 966, 155 Ill.Dec. 493, 569 N.E.2d 1104, 1110 (1991).

**9.** At oral argument, Plaintiff stated that he was arguing "defamation by implication" under *Locricchio v. Evening News Association,* 438 Mich. 84, 476 N.W.2d 112 (1991). The Court finds *Locricchio* wholly inapplicable here. That case

involved the plaintiff's claim against a newspaper that, notwithstanding the truth of the text of a newspaper article, the newspaper's headlines could be reasonably read to imply that Plaintiff committed a crime. The *Locricchio* court noted that the "defamation by implication" doctrine has not been extended in Michigan to cases involving private-figure plaintiffs such as Plaintiff Rueckert in this case. The plaintiff in *Locricchio,* however, argued that the doctrine should

Based upon the foregoing discussion, the Court finds that Defendants are entitled to summary judgment on all of Plaintiff's state law tort claims.

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED in its entirety, with prejudice.

be applied in that case, which involved a private figure plaintiff, and a media defendant and a matter of public concern. Despite the presence of a media defendant and a matter of public concern, the Court refused to find the doctrine applicable, finding that an "implication" of criminal conduct was insufficient to establish a defamation claim; the plaintiff still had to prove that the publication was false. Here, Plaintiff testified in his deposition that what he told his family and co-workers was that he was arrested and taken to jail and that he was suspected of having acted improperly with Lauren Castle. None of this is false. Therefore, even under *Locricchio*, Plaintiff does not make out a defamation claim.